23CA1627 Marriage of Jacobs 02-19-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1627
El Paso County District Court No. 22DR30450
Honorable Diana K. May, Judge

---

In re the Marriage of

Rachel Kyle Jacobs,

Appellee,

and

Frank Arlen Jacobs, Jr.,

Appellant.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE SULLIVAN
Berger*, J., concurs
Welling, J., concurs in part and dissents in part

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 19, 2026

---

Hogan Lovells US LLP, Elizabeth A. Och, Valerie Marshall, Denver, Colorado,
for Appellee

Law Office of Joel M. Pratt, Joel M. Pratt, Colorado Springs, Colorado, for
Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     In this dissolution of marriage case involving Frank Arlen Jacobs, Jr. (father) and Rachel Kyle Jacobs (mother), father appeals the parental responsibilities, spousal maintenance, and child support aspects of the permanent orders.  We affirm in part, reverse in part, and remand for additional proceedings.

## I.     Relevant Facts

¶ 2     The parties married in 2010 and had four children.  Mother filed a petition for dissolution in March 2022.

¶ 3     Following a three-day hearing, the district court dissolved the marriage and issued detailed permanent orders.  The court named mother the children's primary residential parent, adopting a "4/3/5/2 plan" in which father had five overnights with the children every two weeks and mother had nine.  After determining that father had engaged in child neglect and domestic violence, the court allocated sole decision-making responsibility to mother.  The court denied father's request for spousal maintenance and ordered him to pay mother monthly child support of $487.

¶ 4     Father now appeals.

## II. Allocation of Parental Responsibilities

¶ 5 Father contends that the district court abused its discretion by granting mother most of the parenting time and sole decision-making authority. We discern no abuse of discretion.

### A. Standard of Review

¶ 6 A district court has broad discretion in allocating parental responsibilities, and we exercise every presumption in favor of upholding its decision. *See In re Marriage of Collins*, 2023 COA 116M, ¶ 8 (parenting time); *In re Marriage of Morgan*, 2018 COA 116M, ¶ 23 (decision-making responsibility). We won't disturb the court's decision unless it abused its discretion, meaning that it acted in a manifestly arbitrary, unreasonable, or unfair manner, or it misapplied the law. *See Collins*, ¶ 8; *Morgan*, ¶ 26; *In re Marriage of Dale*, 2025 COA 29, ¶ 7.

¶ 7 Whether the district court applied the correct legal standard is a question of law we review de novo. *Dale*, ¶ 8. We also review de novo the court's statutory interpretation and application. *Id.* When interpreting a statute, we strive to ascertain and effectuate the legislature's intent. *In re Marriage of Zander*, 2021 CO 12, ¶ 13. Our starting point is always the statute's plain language, which we

construe according to its ordinary and natural meaning. *Id.* If the statutory language is unambiguous, we apply it as written. *In re Marriage of Smith*, 2024 COA 95, ¶ 22. But if the language is ambiguous, we may look to other interpretative tools, like legislative history, to discern the legislature's intent. *See id.*

### B. Applicable Law

¶ 8 In allocating parental responsibilities, a district court must focus on the children's best interests, prioritizing their safety and physical, mental, and emotional conditions and needs. *See* §§ 14-10-123.4(1)(a), -124(1.5), (1.7), C.R.S. 2025; *In re Marriage of Pawelec*, 2024 COA 107, ¶ 43.

¶ 9 For parenting time, the district court must consider all relevant factors, including those listed in section 14-10-124(1.5)(a). *Pawelec*, ¶ 43.

¶ 10 For decision-making responsibility, the district court must consider the factors in section 14-10-124(1.5)(a), plus the three additional factors in section 14-10-124(1.5)(b). *Morgan*, ¶ 21.

¶ 11 In both situations, the district court must evaluate credible allegations of child neglect and domestic violence. *See* § 14-10-124(1.5)(a)-(b), (4)(a). If either is proved by a preponderance of the

evidence, the court's primary concern becomes the safety and well-being of the children and the abused party. § 14-10-124(4)(d).

¶ 12    When the court finds that a parent has committed child abuse or neglect, joint decision-making responsibility isn't in the children's best interests if the other parent or the children's legal representative objects. § 14-10-124(4)(a)(I). A finding of domestic violence, on the other hand, doesn't automatically bar the court from allocating joint decision-making responsibility, provided credible evidence shows that the parties can make decisions cooperatively in the children's best interests in a manner that is safe for the abused party and the children. § 14-10-124(4)(a)(II)(A); *Morgan*, ¶ 22.

### C.    Analysis

### 1.    Parenting Time

¶ 13    The district court first determined that father committed acts amounting to child neglect and domestic violence. As to child neglect, the court found that father left the youngest child, then four years old and in father's sole care, inadequately dressed for winter and unsupervised for an "extended period of time." The child then left the house unattended, crossed streets, and "wandered"

through the neighborhood until a stranger found him. As to domestic violence, the court credited mother's testimony describing father's controlling behavior and emotional abuse during the marriage.

¶ 14    The district court then carefully analyzed the statutory best interests factors, making the following findings:

- Father sought equal parenting time. *See* § 14-10-124(1.5)(a)(I) (directing the district court to consider the parents' wishes).

- Mother requested that father's parenting time be supervised or, alternatively, that the court award her the bulk of the time based on a two-week rotating schedule. *See id.*

- The children lacked sufficient maturity to express a meaningful parenting time preference. *See* § 14-10-124(1.5)(a)(II) (directing the district court to consider the children's wishes).

- Both parties had positive relationships with the children, and the maternal grandparents were actively involved in the children's lives. *See* § 14-10-124(1.5)(a)(III) (directing

the district court to consider the interaction and interrelationship of the children with their parents, siblings, and any other person who may significantly affect their best interests).

- To help the children maintain stability in their home and school environments, the court awarded mother the marital home. *See* § 14-10-124(1.5)(a)(IV) (directing the district court to consider the children's adjustment to their home, school, and community); *see also* § 14-10-113(1)(c), C.R.S. 2025 (the district court should consider the desirability of awarding the family home to the spouse with whom any children reside most of the time).

- The children were physically and mentally healthy. *See* § 14-10-124(1.5)(a)(V) (directing the district court to consider the mental and physical health of all individuals involved).

- Increased overnights with mother would better support the children's well-being and stability. *See id.*

- Father's mental health concerns, including a need for domestic violence treatment, were also relevant. *See id.*

6

- Mother actively encouraged the children's relationship with father. *See* § 14-10-124(1.5)(a)(VI) (directing the district court to consider each parent's ability to encourage the sharing of love, affection, and contact between the children and the other parent).

- In contrast, father let his anger, hurt, and disappointment hinder his ability to encourage the children's relationship with mother. *See id.*

- While not an absent parent, father wanted to be the "fun" parent, often neglecting the necessary responsibilities to support the children. *See* § 14-10-124(1.5)(a)(VII) (directing the district court to consider whether the parents' past pattern of involvement with the children reflects a system of values, time commitment, and mutual support). Specifically, father had demonstrated the ability to care for the children safely since the parties' separation but remained occasionally "distracted." *See id.*

- Mother regularly met the children's needs, such as enrolling them in school and taking them to medical

7

appointments, thus showing a stronger commitment to their day-to-day care. *See id.*

- The parties lived close enough to facilitate regular parenting time exchanges. *See* § 14-10-124(1.5)(a)(VIII) (directing the district court to consider the parents' physical proximity to each other as it relates to the practical considerations of parenting time).

- Mother placed the children's needs above her own, while father struggled to do so. *See* § 14-10-124(1.5)(a)(XI) (directing the district court to consider each parent's ability to place the needs of the children ahead of his or her own needs).

- Father's focus on "punishing" mother and "being right" overshadowed fostering the relationship between her and the children. *See* § 14-10-124(1.5)(a)(VI), (XI). As one example, during an exchange on a snowy winter day, father refused maternal grandmother's request to bring the children inside, choosing instead to keep them in the car to document mother's purported tardiness, which he

8

believed established mother's noncompliance with the court's temporary orders.

¶ 15     From those findings, the district court denied both mother's request that father's parenting time be supervised and father's request for equal time.  Rather, the court adopted the two-week rotating schedule proposed by mother:

- Week One: Father has the children from Sunday to Tuesday; mother has Wednesday to Saturday.

- Week Two: Mother has Sunday as well as Wednesday through Saturday; father has Monday and Tuesday.

¶ 16     Because father doesn't contest the factual findings, we accept them as true.  *See In re Marriage of O'Connor*, 2023 COA 35, ¶ 11.

¶ 17     Father argues that the district court's findings don't demand a significantly unequal parenting time allocation, nor does the adopted schedule remedy the purported concerns identified by the court.  To get there, father says that (1) awarding mother the marital residence didn't necessitate reducing his parenting time; (2) if the court truly had safety concerns regarding his domestic violence, it would have given him even fewer overnights; and (3) a

less "convoluted" schedule could have preserved the children's stability while minimizing parental interaction.

¶ 18    Father's argument in essence asks us to reweigh the evidence and the best interests factors in his favor. But that isn't our role, nor can we substitute our judgment for that of the district court, even if the evidence and the factors could support a different conclusion. *See In re Marriage of Thorburn*, 2022 COA 80, ¶ 49 (the district court, not a reviewing court, determines witness credibility and the weight, probative force, and sufficiency of the evidence, including the inferences and conclusions drawn from the evidence); *In re Marriage of Nelson*, 2012 COA 205, ¶ 35 (When reviewing for an abuse of discretion, even where "there is evidence in the record that could have supported a different conclusion, we will not substitute our judgment for that of the district court."); *In re Marriage of Newell*, 192 P.3d 529, 534 (Colo. App. 2008) (deferring to the magistrate's choice between competing parenting plans when evidence conflicted regarding which plan would best serve the child's best interests).

¶ 19    The district court applied the correct legal standard, evaluated each relevant best interest factor, and made detailed factual

findings supported by the record.  Among the factors weighing in mother's favor, the court found that father committed child neglect and domestic violence; that mother supported the children's relationship with father to a greater extent than father supported their relationship with mother; that mother provided more consistency in meeting the children's needs; and that father's disdain and negative feelings toward mother impaired his ability to place the children's needs above his own.

¶ 20    At bottom, because the district court acted within its broad discretion when determining parenting time based on the children's best interests, we won't disturb its decision.  *See Collins*, ¶ 8.

### 2.    Decision-Making Responsibility

¶ 21    Father next contends that the district court erred by granting mother sole decision-making responsibility.  According to father, the court misinterpreted the definition of child abuse in section 18-6-401(1)(a), C.R.S. 2025, which includes child neglect.  *See* § 14-10-124(4)(a)(I) (defining "child abuse or neglect" by cross-referencing the definition of child abuse found in the criminal code at section 18-6-401(1)(a)).  Father argues that the phrase "ultimately results in the death of a child or serious bodily injury to a child" applies to

all definitions of child abuse under section 18-6-401(1)(a). Thus, father asserts that because the youngest child didn't suffer either death or serious bodily injury when he wandered out of the house unattended, father's conduct can't be considered child neglect under section 14-10-124(4)(a)(I). We disagree with father's interpretation.

¶ 22     Before allocating decision-making responsibility, the district court must consider any credible evidence of child abuse or neglect as defined in the criminal code at section 18-6-401(1)(a). *See* § 14-10-124(4)(a)(I).

¶ 23     Section 18-6-401(1)(a) provides the following definition:

> A person commits child abuse if such person [1] causes an injury to a child's life or health, or [2] permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or [3] engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.

¶ 24     By using the disjunctive "or," the statute establishes three distinct definitions for child abuse or neglect, shown by the bracketed numbering we've added above. *See Lombard v. Colo.*

*Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 571 (Colo. 2008) ("Generally, we presume the disjunctive use of the word 'or' marks distinctive categories."); *People v. Weeks*, 2015 COA 77, ¶ 45 (Section 18-6-401(1)(a) "delineates three categories of child abuse.").

¶ 25    Despite these distinct categories, father seeks to graft the phrase "ultimately results in the death of a child or serious bodily injury to a child" from the third definition onto the first two.  But *Weeks* rejected that reading.  *See Weeks*, ¶ 70.  The *Weeks* division examined both the plain language and legislative history of section 18-6-401(1)(a), concluding that the phrase applies exclusively to the third definition involving an "accumulation of injuries."  *Weeks*, ¶ 70.  We agree with the *Weeks* division's interpretation and see no reason to depart from it in this case.  *See Chandler-McPhail v. Duffey*, 194 P.3d 434, 440 (Colo. App. 2008) (absent a contrary intention, the last antecedent rule dictates that referential and qualifying words and phrases refer exclusively to the clause immediately preceding them).

¶ 26    Applying that interpretation here, the second definition says that a person commits child abuse or neglect if they permit a child to be unreasonably placed in a situation that poses a threat of

13

injury to the child's life or health. *See* § 18-6-401(1)(a). No actual harm need occur. *See People v. Ortiz*, 155 P.3d 532, 533 (Colo. App. 2006) (child abuse conviction affirmed where the child was left alone in a car at night, even though no actual harm occurred).

¶ 27 The district court properly determined that father's conduct posed a serious threat to the youngest child's life or health. *See* § 18-6-401(1)(a); *People v. Sherrod*, 204 P.3d 472, 475 (Colo. App. 2007) (the term "health" includes both physical and mental well-being), *rev'd on other grounds*, 204 P.3d 466 (Colo. 2009). The record shows that father left the four-year-old child unsupervised and improperly dressed for winter, permitting the child to wander through the neighborhood for a considerable time, including crossing streets. When located by a stranger, the child appeared scared and asked for mother. This child neglect determination, standing alone, is sufficient to support the court's decision granting sole decision-making responsibility to mother. *See* § 14-10-124(4)(a)(I).

¶ 28 Because the district court's child neglect finding independently supports its decision to allocate sole decision-making responsibility

to mother, we need not address father's challenge to the court's domestic violence determination under section 18-6-401(1)(a).

### III.  Maintenance and Child Support

¶ 29      Father next contends that the district court erred by finding that he was voluntarily underemployed and by imputing additional income to him when calculating maintenance and child support. We agree.

### A.  Standard of Review

¶ 30      We review maintenance and child support orders for an abuse of discretion.  *See In re Marriage of Medeiros*, 2023 COA 42M, ¶ 58 (maintenance); *Collins*, ¶ 37 (child support).  And as before, we review de novo whether the district court correctly applied the relevant legal standards.  *See Medeiros*, ¶ 58; *People v. Martinez*, 70 P.3d 474, 476 (Colo. 2003); *Collins*, ¶ 37.

### B.  Applicable Law

¶ 31      When calculating maintenance and child support, income refers to a party's actual gross income if the party is fully employed. § 14-10-114(8)(a)(II), C.R.S. 2025 (maintenance); § 14-10-115(3)(c), C.R.S. 2025 (child support).  If, however, a party is voluntarily underemployed, maintenance and child support must be based on

that party's potential income.  § 14-10-114(8)(c)(IV) (maintenance); § 14-10-115(5)(b)(I) (child support).

¶ 32    In this context, "voluntarily" means "intentionally, of free will." *In re Marriage of Garrett*, 2018 COA 154, ¶ 10 (quoting *Martinez*, 70 P.3d at 478).  "Potential income" is the amount a party could earn from a full-time job commensurate with the party's demonstrated earning ability.  *In re Marriage of Capparelli*, 2024 COA 103M, ¶ 35. The analysis of voluntary underemployment is the same for purposes of calculating both child support and maintenance. *In re Marriage of Wright*, 2020 COA 11, ¶ 21 n.3.

¶ 33    Before imputing income, the district court must find that the party is unreasonably forgoing higher-paying, obtainable employment with the intent to shirk their financial support obligations.  *Collins*, ¶ 29; *see In re Marriage of Young*, 2021 COA 96, ¶ 22.  The district court should exercise caution when imputing income.  *Garrett*, ¶ 10.

### C.    Discussion

¶ 34    In determining child support, the district court acknowledged father's education, work history, and specialized experience in the satellite field.  The court found that he had recently re-entered the

job market, was working full time, and was earning what the court characterized as a "good salary" of $122,000 per year. Drawing from a vocational expert's testimony and report, the court found that father could potentially earn up to $150,000 per year and was therefore "slightly underemployed." The court added that father might receive salary increases in the future and that he can, and should, pursue higher-paying opportunities. It ultimately imputed an additional $28,000 in annual income to father for a total of $150,000 (or $12,500 per month).

¶ 35    The court again used this figure when separately denying father's request for spousal maintenance, saying that it had "already found" father's total monthly income to be $12,500. We construe this order as incorporating the court's prior finding that father was slightly underemployed. *See* § 14-10-114(8)(c)(IV).

¶ 36    We conclude that the district court's findings fall short of satisfying the legal standard for imputing income based on voluntary underemployment. The mere existence of higher-paying jobs or a party's theoretical ability to earn more doesn't, by itself, justify a finding of voluntary underemployment. *See Collins,* ¶ 29. Put differently, the law doesn't demand that a party maximize their

income at all costs; it requires only that they refrain from unreasonable or bad faith employment choices that shirk their support obligations. *See id.*

¶ 37 Critically, the district court made no finding that father unreasonably rejected better-paying work for the purpose of evading his support obligations. Nor does the record support such a conclusion. Father secured a full-time job near his home in Colorado Springs, earning a "good salary" of $122,000 per year. No evidence suggested that he was attempting to shirk his support obligations. To the contrary, father testified that after submitting forty job applications he obtained just one other job offer at a slightly higher salary of $130,00 per year, but that job was located in Denver and required national travel that wouldn't "fit a family work-life schedule."

¶ 38 We recognize that the court found that father "should have been looking for [a job] a long time" before mother filed the dissolution petition, suggesting that father wasn't fully diligent in his job search. But even accepting that finding, the court's findings still don't reveal that father intended to shirk his obligations by unreasonably forgoing higher-paying employment. *See Collins,*

18

¶ 29; *see also Martinez*, 70 P.3d at 480-81 (explaining a parent's "lack of initiative" is one factor the court may consider in determining whether that parent is voluntarily underemployed but nonetheless reversing because the trial court "failed to examine all relevant factors," including the father's search for other jobs and his reasons for moving closer to family). And given the findings made by the court on the record before it, we perceive no basis for any such shirking finding. As a result, we conclude the court erred by imputing income to father.

¶ 39 Accordingly, we reverse the portion of the judgment ordering father to pay child support and declining to award him spousal maintenance. On remand, the district court must consider the parties' current financial circumstances when recalculating father's income and use its new calculation to revisit maintenance and child support. *See In re Marriage of Schaefer*, 2022 COA 112, ¶ 41. The existing maintenance and child support orders will remain in place pending the court's entry of new orders. *See id.*

## IV. Disposition

¶ 40 We affirm the portion of the district court's judgment allocating parental responsibilities, reverse the portion ordering

19

father to pay child support and declining to award him spousal maintenance, and remand the case for additional proceedings consistent with this opinion.

JUDGE BERGER concurs.

JUDGE WELLING concurs in part and dissents in part.

JUDGE WELLING, concurring in part and dissenting in part.

¶ 41 I am fully on board with the majority's disposition of the parenting time and decision-making issues. I am also on board with the majority's reversal of the child support order and its rationale for doing so — namely, that the district court failed to make shirking findings when imputing income and that, in any event, the record that was before the district court at the time of the permanent orders wouldn't have supported such a finding.

¶ 42 Where I part ways with the majority is regarding its conclusion that the same error that necessitates reversal of the child support order also necessitates reversal of the court's decision not to award father maintenance. I, instead, conclude that, based on the record before us, this error was harmless with respect to the court's maintenance determination. The parties' combined annual income exceeded $240,000 — the top of the income range requiring the court to calculate guideline maintenance. So, unless the court's error in calculating father's gross income undermines the reliability of the maintenance determination in some other respect, that error doesn't require reversal. Because I conclude it didn't, I wouldn't reverse the court's maintenance determination.

21

¶ 43    A district court's decision to award maintenance generally requires the court to follow a three-step process.  *See In re Marriage of Wright*, 2020 COA 11, ¶¶ 14-16 (discussing the three-step framework set forth in section 14-10-114(3), C.R.S. 2025).  The first step requires the court to make several findings, including "[t]he amount of each party's gross income."[1]  § 14-10-114(3)(a)(I)(A), C.R.S. 2025; *Wright*, ¶ 14.  At the outset of step two, the court must determine and consider the "guideline amount and term of maintenance."  § 14-10-114(3)(a)(II)(A).  The guideline amount and term of maintenance are based on the parties' combined gross income, the parties' relative gross incomes, and the duration of the marriage.  § 14-10-114(3)(b).

---

[1] The other required findings are (1) the marital property apportioned to each party; (2) the financial resources of each party, including but not limited to the actual or potential income from separate or marital property; (3) the parties' reasonable financial need as established during the marriage; and (4) whether maintenance awarded would be deductible for federal income tax purposes by the payor and taxable income to the recipient.  § 14-10-114(3)(a)(I)(B)-(E), C.R.S. 2025; *see In re Marriage of Wright*, 2020 COA 11, ¶ 14.  On appeal, father doesn't challenge the propriety of any of these other step-one findings by the district court, so I don't address them further.

¶ 44     But when the parties' combined gross income exceeds $240,000 per year, the three-step process discussed and applied in *Wright* is short-circuited.

> If the parties' combined annual adjusted gross income exceeds two hundred forty thousand dollars, the calculation methodology described in subsection (3)(b)(I) of this section for determining the advisory guideline amount of maintenance does not apply, and the court shall instead consider the factors set forth in subsection (3)(c) of this section in determining the amount of maintenance.

§ 14-10-114(3.5); *see also* § 14-10-114(3)(c) (setting forth a nonexhaustive list of factors a court should consider in fashioning a maintenance award).

¶ 45     Thus, if this were a guidelines case, I would agree with the majority that reversal of the maintenance decision is required.  That is because, pursuant to section 14-10-114(3)(a)(II)(A), the court *must* calculate the guideline amount of maintenance before moving on to considering the statutory maintenance factors set forth in section 14-10-114(3)(c).  *See* § 14-10-114(3)(a)(II)(A)-(B); *see also Wright*, ¶ 15.

¶ 46     But this isn't a guidelines case.  To be sure, the district court was required to calculate the parties' combined gross income in

order to determine whether it exceeded $240,000 per year. And to the extent that the court used an imputed gross income of $150,000 for father instead of his actual gross income of $122,000 for this part of its analysis, I agree with the majority that was error. But, in my view, that error was harmless because mother's gross income alone — $331,296 per year — put the parties over the $240,000 threshold set forth in section 14-10-114(3.5).

¶ 47    And once the district court correctly determined that the parties' combined gross income exceeds $240,000 per year, its determination of whether (and how much and for what term) to award maintenance is governed by the factors set forth in section 14-10-114(3)(c)(I) through (XIII). *See* § 14-10-114(3.5). And, in my view, the court didn't abuse its discretion in applying the section 14-10-114(3)(c) factors, notwithstanding its error in calculating father's gross income.

¶ 48    Factors the court should consider include the "parties' income, employment, and *employability, obtainable through reasonable diligence*," § 14-10-114(3)(c)(V) (emphasis added), and "[t]he financial resources of the recipient spouse, including the actual *or potential income* from separate or marital property or *any other*

*source*," § 14-10-114(3)(c)(I) (emphasis added). Both of these subsections, in my view, permit a court to consider a recipient spouse's potential income without first making a shirking finding. And although the court's findings regarding father's potential income didn't satisfy the requirements for imputing that income for the purpose of a gross income determination, those findings were consistent with findings permitted by section 14-10-114(3)(c)(I) and (V).

¶ 49    Moreover, my review of the record reveals that the district court gave appropriate and adequate consideration to the other factors set forth in section 14-10-114(3)(c). For example, the court explicitly considered the following:

- the property division, including the $92,000 equalization payment father would be receiving;

- the age, health, and education of both parties;

- father's historical earnings, including that "in 2013 [father] was earning almost double what [mother] was earning";

- that father's "earning potential and employability is significant";

- the parties' lifestyle during the marriage; and

- a demonstrated ability on father's part to "invest well."

¶ 50    Thus, in my view, the court's error in failing to correctly determine father's gross income for maintenance purposes only infected its determination of the parties' combined gross income, and not its assessment of the factors for determining the amount and term of maintenance set forth in section 14-10-114(3)(c).  And because the parties' combined gross income exceeds $240,000 regardless of father's gross income, I would conclude that the court's error in making this determination was harmless. Accordingly, I would affirm the district court's maintenance determination.